**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| POWER FORWARD COMMUNITIES, INC.,<br>on behalf of itself and its award subrecipients,<br><br>Plaintiff,<br><br>v.<br><br>CITIBANK, N.A.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:25-cv-2021 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Power Forward Communities, Inc. ("PFC"), on behalf of itself and its award subrecipients, files this Complaint against Citibank, N.A. ("Citibank") and alleges as follows:

### INTRODUCTION

1.      This lawsuit concerns Defendant Citibank's unlawful suspension of accounts containing federal grant funds to which Plaintiff PFC is legally entitled.

2.      PFC, a coalition of five the country's most trusted non-profit organizations, is the prime recipient of a $2 billion award under the National Clean Investment Fund ("NCIF"), part of EPA's Greenhouse Gas Reduction Fund ("GGRF").  In August 2024, PFC was awarded its NCIF grant to finance clean, affordable housing in cities, towns, rural areas, and Tribal communities across the country.  These efforts—to lower families' utility bills, create jobs, and improve community health and safety—have already begun, with PFC announcing an investment of more than $500 million to expand and preserve affordable housing, improve air quality, and create well-paying jobs in rural areas and communities across the nation.

3.      To promote transparency and efficiency in the management of NCIF awards, the U.S. Department of the Treasury executed a financial agent agreement with Citibank, pursuant to which the grant funds of PFC and its award subrecipients (PFC's coalition members and their affiliates) are held at Citibank.

4.      An Account Control Agreement among Citibank, PFC, and EPA, and second-tier Account Control Agreements among Citibank, PFC, and each subrecipient (together, "the ACAs" or "the contracts") recognize that PFC and its subrecipients are the beneficial owners of the Citibank accounts at issue.  Pursuant to the ACAs, Citibank is obligated to perform the "administrative or ministerial" task of releasing funds upon receipt of a transfer instruction from PFC or a subrecipient.

5.      The ACAs authorize Citibank to deviate from that nondiscretionary disbursement obligation in a single scenario: when Citibank receives a "Notice of Exclusive Control" from EPA, as described and modeled in the contracts.  But Citibank has received no such notice.  That action is permitted only in narrow circumstances that are inapplicable where, as here, the grant recipients have acted in good faith to comply with, and achieve the objectives of, their awards.

6.      Although Citibank has not received a Notice of Exclusive Control, EPA's newly confirmed Administrator *has* made unsubstantiated public statements criticizing the NCIF program and its award recipients, including PFC.  On February 12, 2025, EPA Administrator Lee Zeldin first demanded that these contractually obligated and disbursed funds be "immediately return[ed]" to the government, and vowed, without any specific basis for adverse action, that he would "refer[] this matter to the Inspector General's Office and [] work with the Justice Department."  Mr. Zeldin has since acted on these promises and continued to disparage the NCIF program and its award recipients.

7.      The day after Mr. Zeldin's first public statement about the program, on February 13, 2025, Citibank froze PFC's and its subrecipients' funds.  Citibank briefly lifted that freeze to process payments on February 14, 2025, but has refused PFC's and its subrecipients' disbursement requests ever since.  PFC has repeatedly contacted Citibank seeking an explanation for this refusal, but the bank has provided none.

8.      Nor, to PFC's knowledge, has Citibank received a court order or other legal process authorizing it to suspend the accounts at issue.  Indeed, PFC understands from public media reports that, despite multiple attempts by political appointees at EPA and the Department of Justice ("DOJ") to obtain such authority, the federal government has been unable to do so, owing, apparently, to the absence of any indicia of impropriety.  Given this lack of legal authority, an EPA spokesperson stated on March 4, 2025, that "[a]ny freeze on [NCIF] funds is at the discretion of Citibank."

9.      By the plain terms of the ACA, however, Citibank lacks any "discretion" to freeze the accounts of PFC or its subrecipients.  Citibank has, without basis or explanation, wrongfully withheld the grant funds that PFC and its subrecipients have an immediate legal right to possess. Citibank is therefore in breach of the ACA.

10.     These actions have caused and continue to cause real and immediate harm.  PFC has no committed source of funding to replace the grant funds, without which it cannot pay its existing employees (let alone hire the additional staff necessary to implement its workplan), pay its critical service providers and contractors, or keep pace with the requirements of its NCIF workplan.  Without access to their grant funds, PFC and its subrecipients will be unable to meet their obligations under the NCIF program or their commitment to American families to lower energy costs and improve the health, safety, and affordability of housing across the nation.

11.     PFC therefore brings this lawsuit on behalf of itself and its subrecipients to obtain a declaration that Citibank is in breach of the ACA and subrecipient ACAs, to enjoin Citibank from breaching the ACAs, and to compel Citibank to promptly comply with its contractual obligations.

## PARTIES

12.     Defendant Citibank is a national banking association organized and existing under the laws of the United States of America, with headquarters in South Dakota.  It is the wholly owned subsidiary of Citigroup, Inc., headquartered in New York.

13.     Plaintiff PFC is a Delaware non-stock, not-for-profit corporation with its principal place of business in Columbia, Maryland.  PFC, as described by EPA, is "a nonprofit coalition formed by five of the country's most trusted housing, climate, and community investment groups that is dedicated to decarbonizing and transforming American housing to save homeowners and renters money, reinvest in communities, and tackle the climate crisis."  PFC aims to expand and preserve affordable housing, improve air quality, and create well-paying jobs by ramping up simple energy-efficiency and other improvements in single-family and multifamily homes nationwide.  PFC's coalition members (and NCIF grant subrecipient affiliates) are:  Enterprise Community Partners, Inc. (Enterprise Green Accelerator, Inc.), Habitat for Humanity International, Inc. (Habitat Capital LLC), Local Initiatives Support Corporation (LISC Green LLC), Rewiring America, Inc. (Rewiring Community Investment Fund, Inc.), and United Way Worldwide.  The coalition members and/or their affiliates are designated subrecipients of the grant funds awarded to PFC, and in this role are obligated to implement certain objectives of the grant (collectively, the "Subrecipients").

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity between PFC and Citibank.

15.     This Court has personal jurisdiction over Citibank pursuant to New York's long-arm statute (CPLR § 302(a)) because this action arises out of Citibank's transaction of business and possession of real property in this state.  Exercising personal jurisdiction over Citibank also comports with due process because Citibank has purposefully availed itself of the laws of New York by executing ACAs that are to be governed " in accordance with the laws of the State of New York" in the absence of federal law, and which provide that "jurisdiction with respect to the Accounts for purposes of the UCC is, and will continue to be for so long as [the] security interest shall be in effect, the State of New York."

16.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to PFC's claims occurred in this District and the accounts that are the subject of the action are situated in this District.

## STANDING

17.     Plaintiff PFC has standing to bring this action on behalf of itself and the Subrecipients.  As detailed in paragraphs 35–95, each of the Subrecipients is a party to an ACA with Citibank and PFC, and each Subrecipient has been harmed by Citibank's refusal to disburse funds.  Each Subrecipient therefore has standing to challenge Citibank's breach of its contractual obligations and refusal to release funds.

18.     Citibank's violations of PFC's and the Subrecipients' contractual and property rights prevent those entities from decarbonizing and transforming American housing, reinvesting

in communities, and tackling the climate crisis—efforts that go to the very core of PFC's mission. Accordingly, the interests PFC seeks to protect through this lawsuit are germane to PFC's purpose.

19.    Because this Complaint seeks only declaratory and injunctive relief based on violations of contractual and property rights that are substantively identical as to PFC and all Subrecipients, adjudicating this lawsuit does not require the participation of the individual Subrecipients.

## FACTUAL BACKGROUND

### I.    PFC's Award Agreement under the National Clean Investment Fund

20.    In 2022, Congress enacted and President Biden signed into law the Inflation Reduction Act of 2022 ("IRA").  Pub. L. No. 117-169.  Among other components, the IRA amended the Clean Air Act to authorize EPA to make competitive grants under the Greenhouse Gas Reduction Fund ("GGRF").  *See* 42 U.S.C. § 7434.  The grants were to provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services."  *Id.* § 7434(c)(1).

21.    To implement the IRA's requirements, EPA created the National Clean Investment Fund ("NCIF") as well as two other funds not implicated here.  EPA funded the NCIF program with approximately $14 billion appropriated by Congress—$11,970,000,000.00 under 42 U.S.C. § 7434(a)(2) and another $2,000,000,000.00 under 42 U.S.C. § 7434(a)(3).  Congress instructed that these funds remain available to be awarded until September 30, 2024.

22.    On July 14, 2023, EPA released the Notice of Funding Opportunity ("NOFO") No. EPA-R-HQ-NCIF-23 announcing a public competition for the NCIF grant funds.  The NOFO was updated on August 11, 2023 to list additional categories of projects deemed qualified to receive an award.  *See* Exhibit A.

23.    Among other things, the NOFO explained that the "competition will provide grants to 2–3 national nonprofit financing entities to create national clean financing institutions capable of partnering with the private sector to provide accessible, affordable financing for tens of thousands of clean technology projects nationwide."  Exhibit A at 4.  Both individual and coalition applicants were eligible to receive an award.  *Id.* at 21.  The NOFO described coalition applicants as "composed of one lead applicant, which partners with one or more non-lead coalition members that are named in the application and would receive subawards (in the form of subgrants) to carry out a portion of the grant's activities if the application is selected."  *Id.* at 6.  If a coalition is selected for an award, the NOFO explained, "the lead applicant will become the grantee, administer the grant as a pass-through entity for the purposes of 2 CFR Part 200 and the EPA Subaward Policy, and be accountable to EPA for effectively carrying out the full scope of work and the proper financial management of the grant (including subawards to non-lead coalition members)."  *Id.* at 7.

24.    The NOFO "included a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements."   In addition, "[a]pplication requirements covered a diverse set of topics and included not just a detailed project narrative but also a robust set of application attachments."  *See* EPA, Greenhouse Gas Reduction Fund, Review and Selection Process (last updated Aug. 16, 2024)[1]; *see also generally* Exhibit A.

---

[1] Available at:  https://www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.

25.     The NOFO also contemplated "financial agent arrangements with U.S. Department of Treasury" to "ensure that EPA's interests are protected" with respect to drawdown requirements.  Exhibit A at 56.

26.     In response to the NOFO, PFC submitted its application on or about October 12, 2023.  So did dozens of other applicants.  EPA then engaged in a rigorous, multi-stage review and selection process involving nearly 50 federal employees across multiple agencies.

27.     On April 4, 2024, EPA announced that it had selected three awardees for the NCIF program:  PFC, which would receive a $2 billion award; Climate United Fund ("CU"), which would receive a $6.97 billion award; and Coalition for Green Capital ("CGC"), which would receive a $5 billion award.  Per the EPA's press release, with these funds, each awardee would help "deliver accessible, affordable financing for clean technology projects nationwide, partnering with private-sector investors, developers, community organizations, and others to deploy projects, mobilize private capital at scale, and enable millions of Americans to benefit from the program through energy bill savings, cleaner air, job creation, and more."  Press Release, EPA, Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America (Apr. 4, 2024).[2]

28.     PFC developed, and EPA approved, a workplan consistent with the aims of the Inflation Reduction Act, under which Congress appropriated the NCIF funds.  As described in PFC's workplan, the initial version of which is publicly available on EPA's website,[3] the PFC coalition will commit approximately 62% of its investments, or $777 million of the award, to net-

---

[2] Available at:  https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and.

[3] NCIF Workplan – Power Forward Communities, Inc., *available at* https://www.epa.gov/system/files/documents/2024-08/ncif-workplan-pfc.pdf (last visited March 11, 2025).

zero emissions buildings projects.  Approximately 8% of PFC investments, or $106 million of the award, will focus solely on distributed energy generation and storage (though many of PFC's net-zero emissions buildings projects will also involve distributed energy components).  The remaining approximately 30% of PFC investments, or roughly $376 million of the award, will be used to finance rehabilitation and new construction of single-family and multifamily qualified projects in low-income and disadvantaged communities.  Consistent with the terms of its Award Agreement, PFC will deploy approximately 86% of its investments ($1.09 billion) in low-income and disadvantaged communities, approximately 15% ($185 million) in rural communities, and approximately 2% ($24 million) in Tribal communities.

29.     On August 8, 2024, PFC and EPA entered into an Award Agreement with respect to PFC's $2 billion NCIF award, which was subsequently amended on December 20, 2024 (as amended, the "Award Agreement").  The Award Agreement recognizes PFC's $2 billion award and sets forth the terms and conditions of the grant.

30.     The Award Agreement, both as originally executed in August 2024 and as amended, expressly contemplates that the award would be administered by a "Financial Agent." Award Agreement, Sections III.AG, V.  A Financial Agent is defined to mean a "depository institution [] designated as a financial agent of the United States."  *Id.*  PFC was required to "set up and utilize an Account or Accounts at the Financial Agent."  *Id.* at Section III.AG.

31.     Once the "Deposit Account" was established at the Financial Agent, EPA and PFC agreed that PFC was to drawdown the entire award ($2 billion) from the Treasury's Automated Standard Application Payments ("ASAP") system.  Award Agreement, Section V.A.3.  The Deposit Account, not the ASAP system, would then be used as PFC's "operating account for the award."  *Id.*

32.    EPA has complete, real-time view access into all of the Citibank accounts established for PFC and its Subrecipients—meaning that the financial agent arrangement provides significantly greater transparency than the ASAP system.  ASAP permits EPA to see only a running total of grant funds disbursed to a grant recipient, and not the activities of award subrecipients.

33.    Pursuant to the Award Agreement, the Deposit Account was to "consist of three distinct account types ('Budget,' 'Reserve', and 'Program Income from Operations')."  Award Agreement, Section V.A.3.

      a.    The Budget Account would hold the initial funds drawn from the ASAP account, and PFC would "direct the Financial Agent to allocate funds across the various sub-accounts in the Budget Account in accordance with its workplan." *Id.* at Section V.A.3.1.

      b.    The Reserve Account was "intended to enable funds to be set-aside within the Financial Agent for use for any form of Financial Assistance that requires the Recipient to pledge or legally commit." *Id.* at Section V.A.3.2.

      c.    The Program Income from Operations Account would "enable Program Income from Operations … to be held, tracked, and segregated."  *Id.* at Section V.A.3.3.

34.    The Department of the Treasury ultimately selected Citibank as the Financial Agent to administer NCIF grant funds, including those awarded to PFC.

**II.     PFC's Account Control Agreement**

35.     On November 1, 2024, PFC, Citibank, and EPA executed the Account Control Agreement, which the parties amended on January 13, 2025 (as amended, the "ACA").  A copy of the ACA is attached hereto as Exhibit B.

36.     Pursuant to the ACA, Citibank "maintains the Accounts for [PFC]."  Exhibit B, Section 1(a).  Section 1(a) of the ACA provides that "all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of [PFC] are, and will continue to be, credited to the Accounts in accordance with instructions given by [PFC]."  *Id.*

37.     Citibank agreed in the ACA to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by [PFC]." Exhibit B, Section 2.

38.     According to Section 6(a) of the ACA, Citibank's duties, responsibilities, and obligations under the ACA are "administrative or ministerial."  Exhibit B, Section 6(a).

39.     The ACA recognizes one exception to the requirement that Citibank comply with PFC's disbursement instructions:  If Citibank "receives a notice, substantially in the form attached [to the ACA] as Exhibit A (a 'Notice of Exclusive Control') from [EPA] that [EPA] is exercising its right to exclusive control over an Account," Citibank may refuse to comply with PFC's instructions.  Exhibit B, Section 2.  In such a scenario, Citibank must "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such

transfer or redemption of interest or dividends on financial assets in the Accounts … originated by … [EPA], without further consent by [PFC]." *Id.*

40.    Pursuant to the ACA, "the terms and conditions entitled 'Deposit Account at Financial Agent' in the [Award Agreement] indicate the conditions under which [EPA] may exercise its right of control." Exhibit B, Recitals.

41.    The Award Agreement's terms and conditions entitled "Deposit Account at Financial Agent" state:

> Notwithstanding any other provision of this Assistance Agreement, EPA will only furnish the Financial Agent with a Notice of Exclusive Control under an ACA when EPA issues a written determination and finding that [PFC] has failed to comply with the terms and conditions of this Assistance Agreement, and that noncompliance is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse or material misrepresentation of eligibility status, and that EPA has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Federal award, as authorized in the terms of the Assistance Agreement. The written determination and finding and a copy of the Notice of Exclusive Control shall be sent to [PFC] when the Notice of Exclusive Control is furnished to the Financial Agent. EPA and [PFC] have mutually agreed only to the specific process outlined in this term for furnishing a Notice of Exclusive Control instruction to the Financial Agent.

Award Agreement, Section V.A.3.

42.    Any Notice of Exclusive Control, as well as any other notice to Citibank under the ACA, is to be sent to Citibank's office in New York City, New York.  Exhibit B, Section 13.

43.    EPA has not sent Citibank a Notice of Exclusive Control in connection with PFC's accounts.

## III.    The Subrecipients' Account Control Agreements

44.    Consistent with the NOFO, the Award Agreement authorized PFC to issue subawards to carry out parts of its NCIF workplan and required PFC to enter into separate agreements with each Subrecipient, pursuant to which PFC would distribute funds received from its NCIF award.

45.     On or about December 23, 2024, PFC entered into subaward agreements with each of the Subrecipients (collectively, the "Subaward Agreements").  Each Subaward Agreement incorporates by reference the Award Agreement (between PFC and EPA) and requires the Subrecipient to comply with all applicable terms and conditions under the Award Agreement, including specifically any applicable "Financial Agent Terms and Conditions."  Subaward Agreements, Sections 1.3, 8.1, 9.1.

46.     Pursuant to the Award Agreement, it is EPA's right to require PFC to "maintain[] a security interest on all award funds held by its Financial Assistance Subrecipients at the Financial Agent."  Award Agreement, Section V, "Flow-Down Requirements of Deposit Account at Financial Agent."  To secure this interest, on or about January 10, 2025, PFC, Citibank, and each Subrecipient entered into a separate, second-tier Account Control Agreement (a "Subrecipient ACA").

47.     These agreements are substantively identical to one another.  Copies of the Subrecipient ACAs are attached hereto as Exhibits C–H.

48.     Each Subrecipient ACA notes that the Subrecipient granted PFC a security interest in its accounts.  Exhibits C–H at Recitals.

49.     Pursuant to the Subrecipients ACAs, Citibank "maintains the Accounts for the [Subrecipients]," and, generally, "all property (including, without limitation, all funds and financial assets) held by [Citibank] for the accounts of the [Subrecipients] are, and will continue to be, credited to the Accounts in accordance with instructions given by the [Subrecipients]." Exhibits C–H at Section 1(a).

50.     Moreover, Citibank agreed to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the

Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by the [Subrecipients]."  Exhibits C–H at Section 2.

51.    As with the ACA among Citibank, PFC, and EPA, Citibank's duties, responsibilities and obligations under the Subrecipients' ACAs are "administrative or ministerial." Exhibits C–H at Section 6(a).

52.    The Subrecipients' ACAs recognize one exception to the requirement that Citibank comply with the Subrecipients' disbursement instructions:   If Citibank "receives a notice, substantially in the form attached [to the Subrecipients ACAs] as Exhibit A (a 'Notice of Exclusive Control') from [PFC] that [PFC] is exercising its right to exclusive control over an Account," Citibank may refuse to comply with the Subrecipients' instructions.  Exhibits C–H at Section 2. In such a circumstance, Citibank must "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts … originated by … [PFC], without further consent by the [Subrecipients]."  *Id.*

53.    Pursuant to the Subrecipients ACAs, "the terms and conditions in the Subaward Agreement indicate the conditions under which [PFC] may exercise its right of control."  Exhibits C–H at Recitals.

54.    Any Notice of Exclusive Control, or any other notice to Citibank under the Subrecipients ACAs, is to be sent to Citibank's office in New York City, New York.  Exhibits C–H at Section 13.

55.     PFC has not sent Citibank a Notice of Exclusive Control in connection with any Subrecipient account.

**IV.    Citibank Freezes PFC's And The Subrecipients' Accounts Without Explanation**

56.     Prior to February 12, 2025, PFC and its coalition members routinely submitted requests to Citibank to disburse funds pursuant to each entity's respective ACA.  Citibank promptly complied with each of those requests.

57.     On February 12 and/or 13, 2025, PFC submitted instructions to Citibank to disburse funds in accordance with the terms of the ACAs.

58.     Unlike requests submitted prior to that date, Citibank did not timely disburse funds or otherwise respond to PFC's February 12 and 13, 2025 transfer instructions.

59.     On February 14, 2025, having not received a response from Citibank, PFC—together with the other NCIF awardees—sent a letter to Citibank.  PFC, CU, and CGC stated that it was their "understanding … that [EPA] ha[d] not provided a Notice of Exclusive Control as provided for under the ACA, nor [was] there any basis to do so, and the respective ACAs remain in full force and effect and binding upon all parties thereto."

60.     PFC, CU, and CGC continued:

Under these circumstances, [Citibank's] apparent and ongoing refusal to comply with valid disbursement instructions is an active and continuing breach of its obligations under the ACA. This breach has caused and continues to cause significant harm to [PFC, CU, and CGC] that will be difficult to remedy. [PFC, CU, and CGC] cannot pay due invoices, close committed transactions, or fulfill other obligations under their respective Grant Agreements (as defined and identified in the ACAs) with [EPA].

61.     Lastly, PFC, CU, and CGC "demand[ed] that [Citibank] comply with its obligations under the ACAs and immediately disburse [PFC's, CU's, and CGC's] funds in accordance with their instructions to date, and continue to do so as instructed pursuant to the terms of the ACAs."

PFC, CU, and CGC further requested that, in the event Citibank were to refuse to comply, it provide "immediate notice and information in writing regarding the basis for such declination."

62.     Citibank did not respond to the February 14, 2025 letter.

63.     Also on February 14, 2025, PFC submitted two transfer instructions to Citibank: one at 10:29 AM and a second at 4:14 PM.

64.     Citibank disbursed funds in response to the 10:29 AM request that same day, as well as in response to the then-pending February 12 and/or February 13 instructions.  To date, however, Citibank has not disbursed funds in response to the 4:14 PM request.

65.     Since February 14, 2025, PFC and certain Subrecipients have submitted additional requests to Citibank to disburse funds in accordance with the ACAs, including on February 14, March 9, and March 10.

66.     Citibank has failed to disburse funds in response to these requests and has otherwise ignored the transfer instructions.

67.     On February 19, 2025, PFC, CU, and CGC again contacted Citibank regarding its refusal to honor the entities' disbursement instructions.  The correspondence "not[ed] that each of the prime NCIF recipients ha[d] funding requests from Friday 2/14 and Tuesday 2/18, which [were] pending [and] which ha[d] not been disbursed by Citi" and that "[c]ertain subgrantees also ha[d] requested funds which ha[d] not been disbursed."  PFC, CU, and CGC again requested that Citibank "provide the legal basis for [its conduct] or confirm whether it received … a request or … updated guidance from the EPA … or any other governmental agency."

68.     Citibank did not respond to the February 19, 2025 email.

69.     On March 1, 2025, PFC sent another letter to Citibank "to request that Citibank comply with PFC's transfer instructions with respect to its accounts … so that PFC can continue

with its important mission" and "[to] request a meeting as soon as possible to discuss [the] urgent matters."

70.     PFC explained in its letter that Citibank was contractually obligated to carry out PFC's transfer instructions.  PFC noted that "[t]he ACA contemplates only one scenario under which Citibank may be authorized to deviate from those obligations," i.e., "when it receives a 'Notice of Exclusive Control' from EPA," and "[t]o PFC's knowledge, EPA has not issued such a notice[,] [n]or could EPA do so."

71.     PFC reiterated that "[b]ecause of Citibank's failure to adhere to its obligations under the ACA, PFC and its subgrantees face financial shortfalls that imperil their ability to retain employees, deliver on the projects for which the funds are allocated and which they are legally obligated to perform, and meet their other legal obligations."

72.     As of the date of this Complaint, Citibank has not responded to PFC's March 1, 2025 letter.  Nor has Citibank complied with the disbursement requests of PFC or any Subrecipient since February 14, 2025.

73.     In response to a lawsuit filed by another NCIF award recipient, Citibank stated: "Citi has been working with the federal government in its efforts to address government officials' concerns regarding this federal grant program.  Our role as financial agent does not involve any discretion over which organizations receive grant funds.  Citi will of course comply with any judicial decision."[4]

---

[4] Claire Brown, *Climate Nonprofit Sues E.P.A. Over Billions in Frozen Funds*, N.Y. Times, March 10, 2025, *available at* https://www.nytimes.com/2025/03/08/climate/epa-climate-funds-lawsuit.html.

**V.       Citibank Has No Lawful Justification for Freezing the Accounts**

74.      As noted in paragraphs 5, 39, and 52, the ACAs prohibit Citibank from refusing to fulfill a transfer request unless and until it receives a "Notice of Exclusive Control."

75.      Citibank has not received a Notice of Exclusive Control.

76.      In fact, EPA has not even alleged that PFC has failed to substantially comply with the Award Agreement, let alone made such a determination.  Nor has EPA initiated any action to suspend or terminate the Award Agreement.

77.      Based on public news reports, it appears that Citibank has instead frozen PFC's and its Subrecipients' accounts at the arbitrary urging of the new political administration.  But although the new administration has repeatedly disparaged the NCIF program and PFC in recent weeks, it has not obtained a court order or any other legal process that would justify Citibank's freeze.

78.      Two weeks into his tenure as EPA Administrator, Lee Zeldin took to the online platform X to announce EPA's intent to claw back the NCIF grant funds.  Mr. Zeldin demanded that "the Bank must immediately return" the funds.  He also vowed, without any specific basis for adverse action, that he would "refer[] this matter to the Inspector General's Office and [] work with the Justice Department."  EPA is "not going to rest," he pledged, until it has "recovered" the grant funds.

79.      On February 23, 2025, Mr. Zeldin appeared on a national Fox News morning show to discuss the NCIF program.  Mr. Zeldin claimed, without basis, that the program is tainted by conflicts of interest and disparaged PFC based on alleged ties to a former democratic politician.

80.      Mr. Zeldin made attacks on another national Fox News program on March 6, 2025, calling the NCIF program a "green slush fund" and criticizing the existence of the Account Control Agreements with Citibank.

81.     Despite Mr. Zeldin's public statements, EPA has not obtained a court order or other legal process that authorizes Citibank to freeze the funds.  To the contrary, an EPA spokesperson stated on March 4, 2025 that "[a]ny freeze on [NCIF] funds is at the discretion of Citibank."

82.     The new political administration has also turned to the criminal justice system in its attempt to find a basis to withhold PFC's funding.  As with EPA's criticisms, however, none of these efforts justifies Citibank's failure to comply with the ACAs.

83.     As detailed in her February 18, 2025 resignation letter (attached hereto as Exhibit I), on February 17, 2025, Denise Cheung, the head of the criminal division in the U.S. Attorney's Office in Washington D.C., was asked by the Office of the Deputy Attorney General ("ODAG") to review documentation "to open a criminal investigation into whether a contract had been unlawfully awarded by an executive agency before the change in Administration and to issue grand jury subpoenas pursuant to this investigation."  On information and belief, this request related to the NCIF awardees, including PFC.

84.     Upon reviewing the documentation provided by ODAG, Ms. Cheung and other attorneys in the USAO determined that "the predicate for opening such a grand jury investigation" did not exist.  Exhibit I.  ODAG nonetheless asked "that a type of 'freeze letter' requesting that the bank freeze assets" be sent.  *Id.*  On information and belief, the bank to which this letter was to be sent was Citibank.

85.     Ms. Cheung expressed "some concern about the current lack of evidence of any apparent crime and the need to send out any such freeze letter."  Exhibit I.  She also conveyed her view that language proposed by the ODAG—which stated that "the government ha[d] probable cause to believe that the funds on deposit … [were] subject to seizure and forfeiture to the United States based upon violations"—was "not appropriate to the matter at hand."  *Id.*

86.     Ms. Cheung nonetheless emailed the Washington Field Office of the Federal Bureau of Investigations, which in turn issued a letter to Citibank recommending that Citibank impose a thirty-day administrative freeze on certain assets.  Exhibit I.  This was a recommendation only; Citibank was not ordered to freeze any assets.

87.     After the FBI sent this recommendation letter, ODAG instructed Ms. Cheung to send a second letter to Citibank "ordering the bank not to release any funds in the subject accounts."  Exhibit I.  Ms. Cheung refused because, in her view, there was not "sufficient evidence to issue the letter" requested, "including sufficient evidence to tell the bank that there is probable cause to seize the particular accounts identified."  *Id.*  The Interim U.S. Attorney in Washington D.C., Edward Martin, thereafter demanded Ms. Cheung's resignation.  *Id.*

88.     According to reporting by the *Washington Post*, Mr. Martin then personally submitted to a U.S. Magistrate Judge in the District of Columbia a seizure warrant application to freeze PFC's Citibank accounts.  But, according to the *Washington Post*, the Judge rejected the warrant application, finding that the request and the affidavit submitted therewith failed to establish probable cause that could justify a seizure order.

89.     According to the same *Washington Post* report, ODAG then asked another U.S. Attorney's Office (USAO) to launch a grand jury investigation and submit a seizure warrant application to the court.  This USAO, too, refused to do so on the ground that the request was not supported by probable cause.

90.     On March 2, 2025, the Acting EPA Administrator, W.C. McIntosh, formally requested that the EPA Office of the Inspector General review the NCIF program.  In this formal request, Mr. McIntosh wrote that Citibank "voluntarily paused further disbursements, aligning

with the ongoing investigation by DOJ and FBI's publicly reported recommendation to freeze the funds."

91.     None of the foregoing justifies Citibank's actions.  It has received no Notice of Exclusive Control or other legal process authorizing it to suspend the accounts of PFC or the Subrecipients.  Citibank is therefore in breach of the ACAs and is unlawfully withholding funds to which PFC and the Subrecipients are immediately entitled.

## VI.    Citibank's Actions Have Harmed PFC and the Subrecipients

92.     Citibank has prevented PFC and the Subrecipients from accessing their funds for nearly three weeks.  That freeze jeopardizes the ability of PFC and its Subrecipients to carry on day-to-day operation, comply with their legal obligations, and fulfill their respective missions.

93.     By freezing the accounts, Citibank has impaired PFC's and its Subrecipients' ability to pay employees and contractors who perform necessary services.  Numerous PFC and Subrecipient employees' salaries are funded exclusively through the award.  These organizations have also been forced to pause hiring for essential positions, and one organization was forced to retract an offer of employment.

94.     PFC has been unable to pay outstanding invoices from its contractors, including consultants that assist PFC in administering the grant in compliance with the terms of the Award Agreement.  As a result, PFC is at urgent risk of losing these important services due to default.

95.     The budget uncertainty has imperiled PFC's and its Subrecipients' ability to fulfill their missions and meet their obligations under the NCIF workplan.  Ongoing projects are vulnerable to collapse and future projects are stalled.  PFC and its Subrecipients cannot enter into contractual arrangements necessary to advance the NCIF workplan without knowing whether they can meet their financial obligations.  Nor can they issue RFPs or fund projects without knowing

that they have financing to do so.  As a result, PFC is at risk of failing to meet milestones set in the NCIF workplan and its obligations under the Award Agreement.  This causes immediate harm not only to PFC and its Subrecipients, but also to the many families and communities that will benefit from these projects to lower utility bills, create jobs, and improve health and safety.

## CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

96.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

97.    The ACAs are a binding and enforceable agreement between PFC, Citibank, and EPA (as to the primary ACA) and between PFC, Citibank, and the Subrecipients (as to the Subrecipient ACAs).

98.    PFC and the Subrecipients have performed each and every obligation and condition required of them pursuant to the ACA.

99.    PFC provided transfer instructions to Citibank, including on February 14, 2025, and March 10, 2025.  Citibank has not complied with those transfer instructions.

100.    The ACAs require Citibank to "comply with all instructions, notifications, and entitlement orders [it] receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts . . . originated by [PFC]." *See* Exhibits B–H at Section 2.

101.    By failing to distribute the funds as directed by PFC and its Subrecipients, including on February 14, March 9, and March 10, Citibank breached the ACAs.

102.    As a direct and proximate result of Citibank's breach of contract, PFC and its Subrecipients have suffered, and will continue to suffer harm.  This harm has resulted solely from Citibank's own gross negligence or willful misconduct.

103.    Citibank's actions are causing and/or threaten to cause irreparable harm to PFC and its Subrecipients that is not compensable through money damages.

104.    Pursuant to 28 U.S.C. § 2201, PFC is entitled to a declaration that Citibank's failure to disburse funds from PFC's and its Subrecipients' accounts is a breach of the ACAs.

105.    PFC and the Subrecipients are entitled to an injunction against Citibank's wrongful refusal to comply with their disbursement requests.

## COUNT II – CONVERSION

106.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

107.    PFC and its Subrecipients have a legal right to possess and control the grant funds held in their accounts at Citibank, pursuant to the ACAs.

108.    Citibank has wrongfully exercised dominion and a right of ownership over PFC's and its Subrecipients' property by freezing PFC's and its Subrecipients' funds without any authority to do so.

109.    PFC demanded Citibank relinquish its wrongful dominion and control over PFC's and its Subrecipients' property and comply with its obligations under the ACAs through its February 14, 2025 and March 1, 2025 letters to Citibank.

110.    As of the date of this Complaint, Citibank has refused to relinquish its wrongful dominion and control over PFC's and its Subrecipients' property.

111.    As a direct and proximate result of Citibank's conversion of PFC's and its Subrecipients' property, PFC and its Subrecipients have suffered, and will continue to suffer harm.

112.    Citibank's actions are causing and/or threaten to cause irreparable harm to PFC and its Subrecipients that is not compensable through money damages.

113.    Pursuant to 28 U.S.C. § 2201, PFC is entitled to a declaration that Citibank's refusal to disburse funds from PFC's and the Subrecipients' accounts constitutes a conversion of those entities' funds.

114.    PFC and the Subrecipients are entitled to an injunction against Citibank's wrongful retention of PFC's and the Subrecipients' funds.

## COUNT III – REPLEVIN

115.    PFC repeats and incorporates herein by reference every allegation contained in the preceding paragraphs.

116.    PFC and its Subrecipients have a property interest in the NCIF funds in the Citibank accounts.

117.    Upon providing transfer instructions to Citibank, PFC and its Subrecipients obtained exclusive right to possession of the funds.

118.    Upon receiving transfer instructions from PFC and its Subrecipients, Citibank had no right to possess the funds.

119.    Citibank has no lawful authority to freeze PFC's and its Subrecipient accounts, and PFC and its Subrecipients are thus entitled to immediate possession of the funds they have requested to date, including on February 14 and March 10, 2025.

120.    As a direct and proximate result of Citibank's wrongful retention of PFC's and its Subrecipients' property, PFC and its Subrecipients have suffered, and will continue to suffer harm.

121.    Citibank's actions are causing and/or threaten to cause irreparable harm to PFC and its Subrecipients that is not compensable through money damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Power Forward Communities, Inc. respectfully requests that this Court grant the following relief:

i.      Declare that Citibank's refusal to disburse funds from PFC's and the Subrecipients' Accounts constitutes a breach of the ACAs and violates PFC's and the Subrecipient's legal right of ownership in those funds;

ii.     Compel Citibank to disburse all funds PFC and its Subrecipients have requested since February 14, 2025;

iii.    Compel Citibank to comply with its ongoing obligation to disburse funds to PFC and its Subrecipients immediately upon receiving transfer instructions from those entities, except as expressly authorized by the ACA and Subrecipient ACAs;

iv.     Enjoin Citibank from refusing to disburse funds to PFC and its Subrecipients immediately upon PFC's transfer instruction, except as expressly authorized by the ACA and Subrecipient ACAs;

v.      Enter judgment for PFC and against Citibank on all counts of this Complaint;

vi.     Grant any such other relief that the Court deems just and proper.

Dated:  March 11, 2025

Respectfully Submitted,

*/s/ James M. Gross*
_____

Beth C. Neitzel (*pro hac vice* forthcoming)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Tel. (617) 832-1000
bneitzel@foleyhoag.com

Noah C. Shaw (*pro hac vice* forthcoming)
James M. Gross (SDNY Bar No. JG1989)
FOLEY HOAG LLP
1301 Ave. of the Americas
25th Floor
New York, NY 10019
Tel. (212) 812-0400
ncshaw@foleyhoag.com
jgross@foleyhoag.com

*Counsel for Power Forward Communities, Inc.*